[This opinion has been published in *Ohio Official Reports* at 79 Ohio St.3d 329.]

THE STATE OF OHIO, APPELLANT, *v*. SCHLOSSER, APPELLEE.

[Cite as *State v. Schlosser*, 1997-Ohio-705.]

*Criminal law—Racketeer Influenced and Corrupt Organizations—R.C. 2923.32(A)(1) plainly indicates a purpose to impose strict liability.*

Ohio's Racketeer Influenced and Corrupt Organizations statute, R.C. 2923.32(A)(1), plainly indicates a purpose to impose strict liability.

(Nos. 96-1389 and 96-1390—Submitted May 21, 1997—Decided August 6, 1997.)

APPEAL from and CERTIFIED by the Court of Appeals for Montgomery County, Nos. 14976 and 14968.

_____

{¶ 1} In 1991, John D. Schlosser (a.k.a. Michael Schlosser), appellee, opened a telemarketing operation. Appellee placed ads in the local newspaper seeking employees, and interviewed and hired applicants. Appellee purported to represent two catalogue sales companies that sold credit card packages, Family Consumer Union ("FCU") and Universal American Credit Card Company ("UACC").

{¶ 2} The appellee provided telemarketers with lists of names and phone numbers of individuals who had recently been denied a credit card. Telemarketers working for the appellee used telephone scripts originally sent by FCU or UACC, but modified to delete any mention of the catalogue sales and to speak only about the offer of either a Visa or MasterCard. Telemarketers would call individuals outside Ohio from the list and inform them that they were now eligible for a credit card. Potential customers were offered an unsecured Visa or MasterCard with a $5,000 limit, and were also offered either an FCU or UACC credit card. Potential customers were informed that the credit card would cost them either $149.50 or

$179, which would be debited from their checking account. In reality, the scripts provided by FCU and UACC specifically outlined nine criteria which customers had to meet before FCU or UACC would sponsor the customer for a credit card. This information, however, was never given to potential customers and telemarketers were told to stress only the Visa or MasterCard credit cards.

{¶ 3} A telemarketer would request the potential customer's name, address, bank, check number, and "RTN" number from a personal check. After that exchange, customers were transferred to a "verifier," who would confirm the information gathered by the original telemarketer and record the customer's voice on tape for the electronic debit of his or her checking account.

{¶ 4} The appellee instructed his telemarketers to tell customers that the company was located in Virginia Beach, although it was actually located in Montgomery County, Ohio. The appellee told employees that they were not set up to take incoming phone calls because someone might track where they were and call and complain. Telemarketers also told customers that the company was a fully licensed and bonded credit services organization, and the company was federally regulated. However, throughout the course of these transactions, the appellee was not registered with the Consumer Finance Division of the Ohio Department of Commerce.

{¶ 5} After the debit of the customer's bank account, a check processing company would take a percentage and then send the remainder of the $149.50 or $179 to accounts controlled by the appellee. A few of the customers received a catalogue from the company they thought they were doing business with. However, none of the customers in this case received a Visa or MasterCard.

{¶ 6} The appellee was involved in the day-to-day operations of the business. He owned the building out of which he operated the telemarketing company. Appellee had reserved approximately one hundred telephone numbers for the company, which were registered in his name. Other utilities were registered

2

in the name of a company of which the appellee was listed as president. Mail at the building was addressed to appellee. Further, the appellee was responsible for compensating his employees.

{¶ 7} The appellee was convicted of eleven counts of failure to register as a credit services organization in violation of R.C. 4712.02(J), eleven counts of charging an advance fee for credit services in violation of R.C. 4712.07(A), eleven counts of engaging in fraudulent acts in the sale of credit services in violation of R.C. 4712.07(L), and one count of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1), Ohio's RICO statute, with eleven underlying predicate charges of failure to register as a credit services organization in violation of R.C. 4712.02(J). These convictions involved eleven separate victims.

{¶ 8} Prior to jury instructions, the appellee argued that because the RICO statute specifies no degree of culpability, the trial court should instruct the jury on recklessness as the applicable culpable mental state. The trial court instructed the jury, however, that the RICO statute imposes strict liability and thus no culpable mental state was required.

{¶ 9} The court of appeals reversed the RICO conviction, finding that the statute required a finding of recklessness. Finding its judgment to be in conflict with the Court of Appeals for Preble County in *State v. Haddix* (1994), 93 Ohio App.3d 470, 638 N.E.2d 1096, and with the Court of Appeals for Franklin County in *State v. Rice* (1995), 103 Ohio App.3d 388, 659 N.E.2d 826, the court of appeals entered an order certifying a conflict. This cause is now before this court upon our determination that a conflict exists. 76 Ohio St.3d 1475, 669 N.E.2d 857.

---

*Mathias H. Heck, Jr.*, Montgomery County Prosecuting Attorney, and *George A. Katchmer*, Assistant Prosecuting Attorney, for appellant.

*David H. Bodiker*, Ohio Public Defender, and *Hyrum J. Mackay*, Assistant Public Defender, for appellee.

LUNDBERG STRATTON, J.

{¶ 10} The issue in this appeal involves the mental state required for a conviction under Ohio's Racketeer Influenced and Corrupt Organizations ("RICO") statute. In particular, the issue certified to this court by the Court of Appeals for Montgomery County is, "Is any culpable mental state required for a violation of R.C. 2923.32(A)(1) and, if so, what culpable mental state is required?" We hold that Ohio's RICO statute, R.C. 2923.32(A)(1), plainly indicates a purpose to impose strict liability.

{¶ 11} Formerly, legislative silence as to *mens rea* in a statute defining an offense was interpreted as an indication of the purpose to impose strict liability. See, *e.g.*, *State v. Lisbon Sales Book Co.* (1964), 176 Ohio St. 482, 27 O.O.2d 443, 200 N.E.2d 590, paragraph two of the syllabus. However, R.C. 2901.21(B) modified this rule so that "[w]hen the section defining an offense does not specify any degree of culpability, and *plainly indicates a purpose to impose strict criminal liability for the conduct described in such section*, then culpability is not required for a person to be guilty of the offense. When the section neither specifies culpability nor plainly indicates a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense." (Emphasis added.) *Id.*

{¶ 12} R.C. 2923.32(A)(1), Ohio's RICO statute, provides: "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt." With the exception of R.C. 2923.32(A)(3),[1] which sets forth a "knowingly" mental state, R.C. 2923.32 is silent as to what culpable mental state a defendant must possess in order to be convicted.

---

1. R.C. 2923.32(A)(3) refers to "knowingly" receiving and investing proceeds from a pattern of corrupt activity, presumably to protect innocent investors, banks, etc.

**{¶ 13}** The appellate court based its decision on its own previous holdings which  found that R.C. 2923.32(A)(1) neither specifies culpability nor plainly indicates a purpose to impose strict liability.  Thus, the court interpreted R.C. 2901.21(B) to require recklessness as the *mens rea* element for a violation of R.C. 2923.32(A)(1).  We find, however, that the plain language of the statute, the legislative intent and public policy considerations behind the statute, and the varying culpable mental states necessary for the predicate offenses, unequivocally indicate a purpose to impose strict liability for the conduct described in the section.

**{¶ 14}** In general, R.C. 2923.32 is based on the federal RICO statute, Section 1962, Title 18, U.S.Code.  Thus, a review of the purpose behind the federal statute is instructive.  Congress, in enacting the Organized Crime Control Act of 1970, Pub.L. No. 91-452, 84 Stat. 941 (codified at Section 1961 *et seq*., Title 18, U.S.Code) stated:

"The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption;  (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation;  (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes;  (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens;  and (5) organized crime continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally

admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact.

"It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." Organized Crime Control Act of 1970, Statement of Findings and Purpose, 84 Stat. 922, reprinted in 1970 U.S.Code Cong. & Adm. News at 1073.

{¶ 15} Interpreting the *mens rea* requirement of the federal RICO statute, *United States v. Scotto* (C.A.2, 1980), 641 F.2d 47, 55-56, held that the RICO statute does not require any specific intent to engage in an unlawful pattern of racketeering. The United States Supreme Court has also held that it is clearly within Congressional power to create a strict liability offense which dispenses with any element of intent. *United States v. Dotterweich* (1943), 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48. Further, the failure to require *mens rea*, standing alone, does not violate due process. *United States v. Greenbaum* (C.A.3, 1943), 138 F.2d 437.

{¶ 16} Looking to Ohio's statutory history, the Ohio General Assembly unanimously passed the Ohio RICO Act in 1985. 141 Appendices and General Index to the Journals of the Senate and House of Representatives (1985) 236. There is little legislative history regarding the enactment. Senator Eugene Watts, the statute's Senate sponsor, described the Ohio RICO Act as "the toughest and most comprehensive [RICO] Act in the nation" and "state-of-the-art legislation." 57 Ohio Report No. 117, Gongwer News Serv. (June 18, 1985) 3. These comments indicate an intent to impose the greatest level of accountability, *i.e.,* strict liability.

{¶ 17} Offenses under RICO, R.C. 2923.32, are *mala prohibita, i.e.,* the acts are made unlawful for the good of the public welfare regardless of the state of mind.

6

Thus, we agree with the Twelfth District's reasoning in *State v. Haddix* (1994), 93 Ohio App.3d 470, 638 N.E.2d 1096, which stated, "Whether a defendant knowingly, recklessly or otherwise engages in a pattern of corrupt activity, the effect of his activities on the local and national economy is the same. Requiring the finding of a specific culpable mental state for a RICO violation obstructs the purpose of the statute * * *." *Id.* at 477, 638 N.E.2d at 1101. Given these goals, we believe that the General Assembly intended to enhance the government's ability to quell organized crime by imposing strict liability for such acts.

{¶ 18} Therefore, we agree with the *Haddix* court that the legislature intended strict liability under R.C. 2923.32(A)(1) and (A)(2) offenses. *Id.*, 93 Ohio App.3d at 477, 638 N.E.2d at 1100-1101. Several other appellate courts have also taken this approach. *State v. Rice* (1995), 103 Ohio App.3d 388, 659 N.E.2d 826; *State v. Davis* (July 19, 1995), Lorain App. Nos. 94CA005964 and 94CA005970, unreported, 1995 WL 434385; *State v. Post* (Sept. 20, 1996), Lucas App. No. L-95-153, unreported, 1996 WL 532320.

{¶ 19} However, merely committing successive or related crimes is not sufficient to rise to the level of a RICO violation. Both the federal and the Ohio RICO statutes require an "enterprise." The federal RICO statute states that an enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Section 1961(4), Title 18, U.S.Code. In comparison, the Ohio statute states that an enterprise "includes any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. 'Enterprise' includes illicit as well as licit enterprises." R.C. 2923.31(C).

{¶ 20} The federal statute requires a "pattern of racketeering activity," defined as requiring "at least two acts of racketeering activity." Section 1961(5),

Title 18, U.S.Code. Federal cases have required that "to convict for conspiracy to violate RICO the government must prove that the person objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes." *United States v. Martino* (C.A.5, 1981), 648 F.2d 367, 394, citing *United States v. Bright* (C.A.5, 1980), 630 F. 2d 804, and *United States v. Elliott* (C.A.5, 1978), 571 F.2d 880. The Ohio statute, however, uses the phrase "pattern of corrupt activity," defined as meaning "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E).

{¶ 21} Thus, neither statute intended to make a situation such as three robberies committed by the same person a RICO violation. Instead, while slightly different in definition, both statutes attempt to prohibit an *enterprise*. "To obtain convictions, [the state] had to prove that each defendant was voluntarily connected to that pattern and performed at least two acts in furtherance of it." *United States v. Palmeri* (C.A.3, 1980), 630 F.2d 192, 203.

{¶ 22} In this case, the appellee was found guilty of one count of violating R.C. 2923.32(A)(1), RICO, based on one predicate offense: eleven counts of doing business as a credit services organization without being registered with the Division of Consumer Finance of the Ohio Department of Commerce in violation of R.C. 4712.02(J). The court of appeals itself concluded that as a predicate offense, R.C. 4712.02(J) "fall[s] into that category of public welfare offenses the purpose of which is to protect and promote the general welfare of the community, irrespective of the mental state of the Defendant. Strict liability is appropriate to effect the purpose of those statutes. *The failure to specify any culpable mental state in these mala prohibita offenses, along with use of the format 'no person shall * * *' absent any reference to culpability, is clearly indicative of a legislative intent to impose*

*strict liability.''* (Emphasis added.) We agree that a statute may provide criminal liability without *mens rea* consistent with due process if it is a regulatory measure in the interest of public safety. See *United States v. Freed* (1971), 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356. The more serious the consequences of violating a statute are to the public, the more likely it is that the legislature meant to impose liability without fault. *State v. Buehler Food Markets, Inc.* (1989), 50 Ohio App.3d 29, 30, 552 N.E.2d 680, 682.

{¶ 23} For R.C. 2923.32(A)(1), the court did not define any mental state, but instructed the jury to find the appellee guilty if he engaged in a pattern of corrupt activity as defined by the court[2] The predicate offense already required strict liability. It does not make sense to find the appellee guilty of a predicate offense which involves strict liability, and then find that the appellee had to "recklessly" engage in a pattern of corrupt activity. The *pattern* of corrupt activity is demonstrated by the fact that the appellee *committed* the predicate offense. The General Assembly has determined that if a defendant has engaged in two or more acts constituting a predicate offense, he or she *is engaging in a pattern* of corrupt activity and may be found guilty of a RICO violation.

{¶ 24} The RICO statute was designed to impose cumulative liability for the criminal enterprise. In this case, the appellee committed systematic acts of fraud and corruption over the course of four years using a large "enterprise" with a complex setup. During this period of time, the appellee was not registered with the state of Ohio as a credit services organization. The appellee's telemarketing scheme preyed on potential customers who had recently been denied a credit card.

---

2. The jury was instructed that before it could find the appellee guilty, it had to "find beyond a reasonable doubt that between April 16th, 1993, and February 16th, 1994, and in Montgomery County, Ohio * * *, defendant was employed by or associated with an enterprise that did conduct or participate in the affairs of the enterprise through a pattern of corrupt activity." Further, the trial court instructed that "[t]he law imposes strict liability for the conduct described in the offense of engaging in a pattern of corrupt activity, and it is not necessary to prove the person acted with a culpable mental state to be guilty of * * * that offense."

The appellee guaranteed the potential customers a major credit card in exchange for $149.50 or $179. The appellee received the money from the victims, but the victims never received their credit cards. The appellee engaged in a very structured pattern of corrupt activity. To require a reckless mental state for a conviction under R.C. 2923.32(A)(1) would cripple RICO's intended effect to stop such criminal enterprises.

{¶ 25} Therefore, we hold that R.C. 2923.32(A)(1) imposes strict liability for commission of the prohibited acts. The intent of the statute is to impose additional liability for the *pattern* of corrupt activity involving the criminal enterprise. As a strict liability offense, no culpable mental state is required. For the foregoing reasons, we reverse the judgment of the Court of Appeals for Montgomery County on the matter certified for our review and reinstate appellee's conviction for violation of R.C. 2923.32.

*Judgment reversed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

————————————