[Cite as *State v. Baker*, 2013-Ohio-2398.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO.   CA2012-12-127 |
| | : | O P I N I O N |
| - vs - | | 6/10/2013 |
| | : | |
| JUSTIN BAKER, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 12CR28427


David P. Fornshell, Warren County Prosecuting Attorney, Michael Greer, 500 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Ginger S. Bock, P.O. Box 31122, Cincinnati, Ohio 45231, for defendant-appellant


**PIPER, J.**

{¶ 1}   Defendant-appellant, Justin Baker, appeals his convictions and sentence in the Warren County Court of Common Pleas for multiple counts of trafficking in, cultivation of, and possession of marijuana, as well as possession of criminal tools, and engaging in a pattern of corrupt activity.

{¶ 2}   In late 2011, police began investigating Tyler Pagenstecher on suspicion of drug trafficking.   Pagenstecher, who was a juvenile at the time of the initial police

investigation, sold marijuana to his customers, which included other juveniles in the Mason, Ohio area. As part of their investigation, the Warren County Drug Task Force determined that Pagenstecher's supplier was Michael Lopez, who purchased marijuana from a married couple, Cody and Stacy Lampe. The Lampes grew their own marijuana for distribution, and also purchased marijuana grown by Baker. Baker, along with his associate, grew substantial amounts of marijuana in two "grow houses," and later expanded the business and cultivated over 350 marijuana plants in the back portion of a large warehouse.

{¶ 3} The Warren County Drug Task Force apprehended Pagenstecher, and he agreed to assist the task force by arranging a buy from Lopez of his normal purchase of four ounces of marijuana. On January 13, 2012, Pagenstecher, at the behest of the task force, told Lopez to meet him at a Walmart in Warren County, even though the two usually met at a different location outside of Warren County. Members of the task force were waiting for Lopez, and detained him in the Walmart parking lot. Lopez also agreed to assist law enforcement by arranging a buy of one pound of marijuana from the Lampes. As a result of the arranged buy, the Lampes were also apprehended. The Lampes also agreed to assist law enforcement by allowing a conversation with Baker to be recorded wherein Cody Lampe discussed with Baker previous marijuana purchases and the cultivation of marijuana. The task force followed Baker after his conversation with Lampe occurred and observed Baker entering the warehouse where he grew the marijuana, which was located in Blue Ash, Ohio.

{¶ 4} The task force placed the warehouse under surveillance. The task force also found a trailer on the warehouse property that was identified as belonging to Baker. Police then requested and were granted search warrants for the two houses in which Baker grew marijuana, as well as the warehouse. The task force executed the warrants, and recovered 38,000 grams of marijuana from the warehouse and over 9,000 grams of marijuana from one of the homes Baker used as a grow house.

{¶ 5} Police arrested Baker, and he was indicted on three counts of trafficking in marijuana, two counts of possession of marijuana, two counts of cultivation of marijuana, two counts of possession of criminal tools, and one count of engaging in a pattern of corrupt activity. Baker pled not guilty to the charges, waived his right to a jury trial, and elected to have the trial court hear his case. The bench trial occurred over two days, and the trial court found Baker guilty of every charge. The trial court sentenced Baker to serve an aggregate mandatory sentence of eight years. Baker now appeals his convictions and sentence, raising three assignments of error. Because Baker's first and third assignments of error are somewhat interrelated, we will address them together for ease of discussion.

{¶ 6} Assignment of Error No. 1:

{¶ 7} THE TRIAL COURT ERRED BY CONVICTING BAKER IN AN IMPROPER VENUE.

{¶ 8} Assignment of Error No. 3:

{¶ 9} THE TRIAL COURT ERRED BY REFUSING TO APPLY LAW EMPLOYED BY MAJORITY OF OHIO APPELLATE DISTRICTS. [sic]

{¶ 10} Baker argues that the trial court erred by finding him guilty of all of the charges against him when the state failed to prove that the charges were brought in the proper venue because no element of his pattern of corrupt activity occurred in Warren County.

{¶ 11} The Ohio Constitution, Article I, Section 10 establishes a defendant's right to "a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed." According to the Ohio Supreme Court, "Section 10, Article I of the Ohio Constitution fixes venue, or the proper place to try a criminal matter * * *." *State v. Hampton*, 134 Ohio St.3d 447, 2012-Ohio-5688, ¶ 19, citing *State v. Headley,* 6 Ohio St.3d 475, 477(1983). Establishing the correct venue is imperative in order to "give the defendant the right to be tried in the *vicinity* of his alleged criminal activity; the need to have venue is to limit

the state from indiscriminately seeking a favorable location for trial or selecting a site that might be an inconvenience or disadvantage for the defendant." *State v. Meridy,* Clermont App. No. CA2003-11-091, 2005-Ohio-241, ¶ 12. (Emphasis in original.)

{¶ 12} The standard to establish venue is whether appellant has a "significant nexus" with the county where the trial was held, as determined by whether one or more of the elements of an offense occurred in the county in which the charge is brought. *State v. Stone*, 12th Dist. No. CA2007-11-132, 2008-Ohio-5671, ¶ 16. For that reason, and pursuant to R.C. 2901.12(A), "the trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element of the offense was committed."

{¶ 13} While venue is not a material element of any offense charged, the state must nonetheless prove beyond a reasonable doubt that the crime charged was committed in the county where the indictment was returned and the trial held, unless the issue of venue is waived by the defendant. *Meridy at ¶ 12.* As stated by the Ohio Supreme Court, "a conviction may not be had in a criminal case where the proof fails to show that the crime alleged in the indictment occurred in the county where the indictment was returned." *Hampton* at ¶ 19.

{¶ 14} The venue statute provides that when an offender commits offenses in different jurisdictions as part of a course of criminal conduct, venue lies for all the offenses in any jurisdiction in which the offender committed one of the offenses or any element thereof. R.C. 2901.12(H). Offenses "committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective" serve as prima facie evidence of a course of criminal conduct. R.C. 2901.12(H)(3).

{¶ 15} As pertinent to this case, the state alleged that Warren County was the proper venue because Baker engaged in a pattern of corrupt activity within Warren County.

- 4 -

According to R.C. 2923.32(A)(1), "no person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt." R.C. 2923.31(C) defines enterprise as "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. 'Enterprise' includes illicit as well as licit enterprises." "'Pattern of corrupt activity' means two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E).

{¶ 16} Baker argues in his third assignment of error that this court should depart from our precedent in which this court rejected using a three-part test established in *United States v. Riccobene*, 709 F.2d 214 (3rd Cir.1983), when analyzing Ohio's engaging in a pattern of corrupt activity statute. *State v. Dodson,* 12th Dist. No. CA2010-08-191, 2011-Ohio-6222; and *State v. Baker*, 12th Dist. No. CA2011-08-088, 2012-Ohio-887. We decline Baker's request to overrule these cases and adopt the three-part test suggested in *Riccobene*, as well as some Ohio appellate districts. To the extent that Baker has assigned as error the trial court's use of our case precedent, we overrule his third assignment of error.

{¶ 17} We will therefore discuss whether Baker engaged in a pattern of corrupt activity in Warren County using the law established and followed in this district. After reviewing the record, and applying the law of this district, we find that Warren County was not the proper venue to bring charges against Baker, as he did not cultivate/traffic/possess marijuana there, nor did he possess criminal tools or engage in a pattern of corrupt activity in Warren County. The evidence does not establish Baker knew of, conspired with, or had any associate of his engage in conduct involving Baker's enterprise in Warren County.

{¶ 18} By virtue of its indictment of Baker for engaging in a pattern of corrupt activity, the state was alleging that Baker directly or indirectly conducted or participated in corrupt activity with a group of persons associated-in-fact to traffic marijuana in Warren County. To support this claim, the state produced evidence that Baker sold marijuana to the Lampes, that the Lampes sold marijuana to Lopez, that Lopez sold marijuana to Pagenstecher, and that Pagenstecher sold marijuana in Warren County. According to the state, therefore, an element of engaging in a pattern of corrupt activity occurred when Pagenstecher sold marijuana in Warren County thereby providing venue in Warren County. However, the state failed to prove beyond a reasonable doubt that Baker was a direct or indirect participant in the corrupt activity of a group of persons associated-in-fact conducting the affairs of an enterprise in Warren County. Illustrating the point even further, the state did not prove that the marijuana that Baker sold to the Lampes was the same marijuana that was eventually sold in Warren County by Pagenstecher.

{¶ 19} When determining whether a group of people are associated-in-fact, a court will look to whether the group is a "continuing unit that functions with a common purpose." *Baker*, 2012-Ohio-887 at ¶ 10, quoting *Boyle v. United States*, 556 U.S. 938, 939, 129 S.Ct 2237 (2009).[1] The court in *Boyle* was asked to determine whether an association-in-fact must have "an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages."[2] 556 U.S. at syllabus. In analyzing the issue, the court noted

---

1. Because the Ohio statute is based upon the federal RICO statute, Ohio courts have relied upon federal case law when analyzing issues pertinent to engaging in a pattern of corrupt activity. *State v. Schlosser*, 79 Ohio St.3d 329, 332 (1997).

2. The question presented to the United States Supreme Court in *Boyle* makes reference to the third component in the three-part test adopted by the court in *Riccobene*, which required the prosecution to prove that the entity was separate and apart from the pattern of activity in which it engages. As this court stated in *Dodson* and *Baker*, the *Boyle* court rejected the argument that an association-in-fact must contain "an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages." 556 U.S. at 938. Instead, the court reiterated that "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." *Id.* at 951.

that "first, the enterprise must have a 'structure' that * * * has at least three features: a purpose, relationships among the associates, and longevity sufficient to permit the associates to pursue the enterprise's purpose." *Id.* at 939.

{¶ 20} When discussing the structure requirement, the *Boyle* court stated, "the term 'structure' means 'the way in which parts are arranged or put together *to form a whole* and the interrelation or arrangement of parts in a complex entity." *Id.* at 945-946, citing American Heritage Dictionary 1718 (4th Ed.2000). (Emphasis added.) The court went on to state that an "association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct'" and that "the concept of 'association' requires both interpersonal relationships and a common interest." *Id.* at 946 citing *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524 (1981). Moreover, the "defendants must have 'conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs.'" *Ouwinga v. Benistar 419 Plan Services, Inc.*, 694 F.3d 783 (6th Cir.2012), quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S.Ct. 1163 (1993). (Emphasis in original.)

{¶ 21} Even when broadly construing the language of R.C. 2923.32, the record demonstrates that the state failed to prove that there was a structure that revealed Baker acting together with others for the sale of marijuana in Warren County.[3] While longevity is not at issue here, the case lacks the other indicia of "structure" in that there was neither a common purpose established nor relationships among associates to form a whole as contemplated by the *Boyle* court. Nor was there any indication that Pagenstecher or Lopez conducted or participated in conduct that pertained to Baker's enterprise rather than their own affairs. The state urges us to determine that Baker's conduct was part of a "continuing unit that functions with a common purpose" because each of the individuals involved made

---

3. The *Boyle* court stated that the RICO statute should be "liberally construed" to effectuate its remedial purposes. 556 U.S. at 944.

money selling marijuana and are guilty of associating with others who sell or buy marijuana. Such an application of law would transcend the remedial purpose of R.C. 2923.32.

{¶ 22} While the state argued that the group's purpose was to make money, the state did not present evidence that Baker, the Lampes, Lopez, and Pagenstecher formed an entity to earn money as an enterprise. Instead, the testimony revealed that that each individual had his own separate and distinct "business" venture when selling marijuana and that each individual participated in his own affairs. There is no evidence on record that any of the individuals were involved in each other's business affairs, such as setting prices or being assigned to certain "customers" or territories, nor is there any other indication that the parties joined together to make money *for the same enterprise*. There is no conduct, conspiracy, or element of control attributed to Baker placing his enterprise or his associates in Warren County.

{¶ 23} Lopez testified that the Lampes' "business" was "separate" from his own and that he never took directions from the Lampes or Baker on how to "run" his drug sales. Lopez also confirmed that "whatever [his] business was, was [his] business and had nothing to do" with the Lampes or Baker. Nor is there any evidence on the record that Lopez controlled or had any involvement in Pagenstecher's business of selling marijuana. Instead, Lopez testified that he believed that Pagenstecher was a college student at Miami University, and was not even involved in Pagenstecher's drug dealings enough to know that Pagenstecher was actually a high school student who sold to other juveniles.

{¶ 24} Stacy Lampe testified that neither she nor her husband had any control or direction over Lopez's business, and that they sold their marijuana to other people besides Lopez. Cody Lampe testified that his marijuana cultivation could yield approximately five to eight pounds of marijuana, depending on the grow cycle, of which Lopez purchased only a fraction. The Lampes clearly relied on selling marijuana to other clients besides Lopez, and

there is no indication that the Lampes were interested in any enterprise but their own. Nor is there evidence on the record that Baker had involvement in Lopez's business, or that Lopez had a common purpose with Baker in Baker's cultivation and harvesting of marijuana. The state failed to prove that the parties acted jointly for the same enterprise with a common purpose attendant to that enterprise.

{¶ 25} The record also demonstrates that the state failed to establish that the parties had relationships with one another sufficient to establish an enterprise. Baker did not have any relationship with Lopez or Pagenstecher, the supposed participants in his enterprise. Nor did Pagenstecher have a relationship with the Lampes. Instead, the testimony elicited at trial revealed that only the Lampes were associated with Baker, and that neither Lopez nor Pagenstecher knew that Baker, or Baker's enterprise, existed. Pagenstecher testified that he had never heard of, met, seen, talked to, or purchased any marijuana from Baker, and that his only contact was with Lopez. Pagenstecher testified that he did not know where Lopez got the marijuana that Lopez sold. Additionally, there is no indication in the record that Pagenstecher was aware of the Lampes, or had any dealings with them.

{¶ 26} Lopez testified that he purchased marijuana from the Lampes and sold it to Pagenstecher, and that he never had any knowledge where the Lampes procured the marijuana they sold him. Although the state asked Lopez no less than three times and in three different ways whether Lopez was aware of where the Lampes got the marijuana they sold him, Lopez testified each time that he was never aware of the source of the Lampes' marijuana. Lopez also expressly testified that he had no contact with or knowledge of Baker.[4]

---

4. The state argues, and we agree, that members of an enterprise "need not know the identity, or even the number, of his confederates." *State v. Siferd*, 151 Ohio App.3d 103, 2002-Ohio-6801 ¶ 43 (3d Dist.) Even so, the state has to prove that the members were "*voluntarily connected* to the pattern of corrupt activity comprising the enterprise." *Id.* (Emphasis in original.) The fact that neither Lopez nor Pagenstecher knew of Baker's

{¶ 27} The Lampes both testified that they sold marijuana to Lopez, anywhere from a fourth of a pound to a pound at a time. Lopez would pick up the marijuana from the Lampes' home, which is located in Hamilton County. However, and as will be discussed in greater detail later, there was no indication that the Lampes ever sold Lopez the marijuana that they purchased from Baker. Instead, if the Lampes were out of their own supply, they would tell Lopez that they could not fill his order, rather than getting marijuana from Baker to fill Lopez's request. Simply stated, the state did not prove that the parties functioned as separate parts to form a whole, with a shared, common purpose, that Baker engage in the sale of marijuana in Warren County. Thus, there was no association-in-fact as contemplated by Ohio's organized crime statutes.

{¶ 28} Several cases prove helpful when determining whether an association-in-fact exists for purposes of engaging in a pattern of corrupt activity. The Ohio Supreme Court held that engaging in a pattern of corrupt activity is a strict liability offense. *State v. Schlosser*, 79 Ohio St.3d 329 (1997). In so doing, the court noted that the legislature intended to "enhance the government's ability to quell organized crime by imposing strict liability for such acts." *Id.* at 333. Even though the crime is a strict liability offense, the court emphasized that "merely committing successive or related crimes is not sufficient to rise to the level of a RICO violation. Both the federal and Ohio RICO statutes require an 'enterprise.'"[5] *Id.* The court noted that instead of setting forth a mens rea requirement, the legislature promulgated the statute to require that the state prove "an enterprise" existed. *Id.* at 334. In addressing

existence is but one factor we considered when determining whether their participation in the alleged enterprise was a voluntary connection to or association with Baker. In *Siferd*, there was no need to know the exact identities of the participants because evidence in that case established a conspiracy to carry out the entity's criminal purpose.

5. The pattern of corrupt activity must reveal an organization or an association-in-fact, which demonstrates the existence of individuals acting on behalf of, or in furtherance of, the same enterprise.

"enterprise," the court quoted *United States v. Palmer*, 630 F.2d 192, 203 (3rd Cir.1980), which stated, "'to obtain convictions, [the state] had to prove that each defendant was voluntarily connected to that pattern and performed at least two acts in furtherance of it.'"[6] *Id.*

{¶ 29} The record in the case sub judice indicates that Baker, the Lampes, Lopez, and Pagenstecher each committed crimes by selling marijuana at some given point in time. There is little doubt that the parties engaged in a series of drug transactions, which could be described as a "chain." However, the finding of "enterprise" demands more than merely grouping related or successive crimes together. The state did not prove that Lopez or Pagenstecher voluntarily participated in, or were in fact, associated with organized conduct for the purposes or goals of an enterprise existing between Baker and the Lampes.[7] Neither Lopez nor Pagenstecher did anything to further Baker's enterprise, and to the contrary, they sold marijuana to further only their own personal gain.

{¶ 30} This court recently discussed how venue relates to engaging in a pattern of corrupt activity, and found that venue was properly established where elements of an illegal steroid operation were carried out in Warren County. *State v. Mielke*, 12th Dist. No. CA2012-08-079, 2013-Ohio-1612.

{¶ 31} In *Mielke*, the appellant was indicted on several counts of trafficking in steroids, as well as engaging in a pattern of corrupt activity. Although Mielke was not directly involved in the sale of steroids in Warren County, this court found that "his association with the steroid enterprise extended into those areas where the tentacles of the criminal enterprise touched"

---

6. The remedial target of federal and Ohio RICO statutes, being "organized crime" or "racketeering" requires more than individual criminals coming into contact.

7. There seems to be little doubt that Baker and the Lampes participated in each other's enterprises, as the state presented evidence [among other evidence] that Cody Lampe and Baker exchanged tips on cultivating and harvesting marijuana, and that Cody would "clone" his marijuana plants and sell them to Baker. The continuing unit of parts, however, must function as a whole, which, in Baker's enterprise, does not include Pagenstecher or Lopez. *See Boyle.*

Warren County. *Id.* at ¶ 22. In deciding such, this court considered the fact that Matthew Geraci had an enterprise whereby he sold steroids out of his home located in Hamilton County and also sold steroids in Warren County. Geraci had between 15-20 associates, who aided him in distributing steroids. Geraci moved his steroid operation to Blue Ash, also in Hamilton County, and continued to supply steroids by leaving steroids in a locker along with an invoice. His associates would then retrieve the steroids and leave payment in the same locker. Geraci testified that he sold Mielke large quantities of steroids and that Mielke sold 75 percent of those steroids to customers. Agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives began investigating Geraci's operation, and made undercover buys of Geraci's steroids in Warren County from Geraci and a confidential informant working with the agents. This court determined that Warren County held proper jurisdiction to try Mielke for engaging in a pattern of corrupt activity because Mielke "worked with Geraci's enterprise" with a common purpose and acted as one of the tentacles of Geraci's enterprise. *Id.* at ¶ 21. However, the facts of *Mielke* are readily distinguishable from the facts of the case at bar.

{¶ 32} Despite the state's argument, *Mielke* does not stand for the proposition that an enterprise structure can be established by merely showing that criminals associate with one another or that the criminals have a similar proclivity or ambition. Instead, there must be conduct or participation in a structure designed to promote the purpose of a single enterprise.

{¶ 33} Unlike *Mielke* where Geraci specifically sold steroids in Warren County in furtherance of the enterprise, Baker never sold marijuana in Warren County. Also, unlike *Mielke*, neither Lopez nor Pagenstecher were performing activities for Baker's enterprise. In *Mielke*, the appellant only purchased steroids that came from Geraci, which Geraci sold to Mielke in furtherance of his enterprise, an enterprise that explicitly engaged in a pattern of corrupt activity by selling steroids in Warren County. Here, however, neither Pagenstecher nor Lopez purchased marijuana from Baker in order to further Baker's enterprise, nor did they

- 12 -

associate with Baker.

**{¶ 34}** During the bench trial, as well as on appeal, the state relied upon *State v. Koval*, 12th Dist. No. CA2005-06-083, 2006-Ohio-5377, for the proposition that venue is proper where at least one element of engaging in a pattern of corrupt activity occurred in Warren County. In *Koval*, Adam Danner (who lived in Warren County) sold marijuana and cocaine. As part of his business, Danner received shipments of the drugs from other states and the shipments were made to various drop-off locations in Warren County. Danner would then take the shipments to Koval's home in Butler County for storage, preparation, and sale. Once the drugs were processed, Danner would sell the drugs in Butler and Warren Counties. This court found that venue was proper in Warren County because Koval engaged in a pattern of corrupt activity where part of the drug enterprise did business in Warren County.

**{¶ 35}** Unlike *Koval,* where Danner and Koval participated in an enterprise together as partners to further their drug enterprise by accepting drug shipments and later selling drugs in Warren County, Baker's enterprise never touched Warren County. Instead, all of Baker's cultivation, preparation, and sales of his marijuana occurred at locations in Hamilton and Butler Counties. Baker only sold his product to the Lampes, which also occurred in either Butler or Hamilton Counties. Baker never accepted drug shipments or sold his product in Warren County. Baker never directed or steered his associates to further his enterprise in Warren County. Further highlighting that lack of Baker's enterprise in Warren County is the trial court's finding that no marijuana that Baker grew ever entered Warren County. The trial court, who is in the best position to judge the credibility of the witnesses, stated, "I do not find that there was evidence that showed that the marijuana that was grown by Mr. Baker *ever* made it to Warren County." (Emphasis added.) [8] Instead, the evidence demonstrated that

---

8. We note that the Supreme Court has recently stressed the importance of appellate review adhering to a trial court's findings. *State v. Graham*, Slip Opinion No. 2013-Ohio-2114, ¶ 26.

the Lampes had an extensive grow operation that yielded five pounds of marijuana on one grow cycle and two to three pounds on the other grow cycle, for approximately eight pounds of total marijuana production. However, Lopez only purchased a fraction of that, as he purchased on average a quarter pound, or at most, one pound every few weeks. Neither Stacy nor Cody Lampe testified that they specifically purchased marijuana from Baker to sell directly to Lopez, and Cody Lampe testified that he did not call Baker if they did not have marijuana on hand to sell to Lopez. During Cody's cross-examination, the following exchange occurred.

> [Q] And isn't it true that on a number of occasions if [sic] Mr. Lopez has testified that on a number of occasions he might contact your wife to purchase some marijuana, but you or she informed him you were out and didn't have any available?
>
> [A] It would happen from time to time.
>
> [Q] Okay. And certainly you didn't say to him, hey, just wait about an hour and I'm going to call [Justin] Baker and bring over some marijuana to sell to you. You didn't do that, you just couldn't sell to him at that point, right?
>
> [A] That's correct.

{¶ 37} There was also evidence that when Baker did sell the Lampes marijuana, the marijuana was packaged in large zip-lock bags and delivered in a five-gallon bucket. However, on the day that Lopez purchased marijuana from the Lampes during the controlled buy, Stacy Lampe sold Lopez marijuana that was located on a dresser in the Lampes' basement, rather than from the bucket that Baker provided. During Cody Lampe's cross-examination, the following exchange occurred.

> [Q] If I tell you that I've got photographs and I'll show them to you in just a moment, of your house after the raid, after they had arrested or at least come there and busted your operation, this was sitting in the basement of your house, the very bucket, that's where it was retrieved from. Does it sound to you like this marijuana is what you bought from [Baker] and is sitting in your house?

[A] Yes.

[Q] All right. And so one thing that we know for sure is that this marijuana, the only date you have specific in mind, January 28th, on February 1st when Michael Lopez bought a pound of marijuana from your wife, it didn't come from the supply or, excuse me, didn't come from the bucket that [Justin] Baker sold you, correct?

[A] That's correct.

[Q] And you had your own grow operation, true?

[A] That is correct.

The bucket, which was photographed and inventoried, contained all of the marijuana that the Lampes had purchased from Baker, therefore indicating that the marijuana sold to Lopez did not come from Baker's grow. The trial court's finding that none of Baker's marijuana made it to Warren County was supported by the record.

{¶ 38} The state failed to prove that Baker engaged in a pattern of corrupt activity because there was no evidence that Baker was involved in an association-in-fact with Lopez or Pagenstecher. While it is abundantly clear that Baker engaged in a pattern of corrupt activity in Butler and Hamilton Counties, no element of his offenses occurred in Warren County. Therefore, the state failed to prove venue beyond a reasonable doubt and an acquittal must be entered upon the record. *State v. Hampton*, 134 Ohio St.3d 447, 2012-Ohio-5688.

{¶ 39} While our decision today results in a distasteful outcome, the state made the choice to bring these charges in Warren County despite having at least two clearly established venues (Hamilton and Butler Counties), and instead chose a venue with no "significant nexus" to Baker's crimes. We are aware that by sustaining Baker's first assignment of error, Baker's convictions are reversed and vacated and that double jeopardy attaches to bar the State of Ohio from prosecuting these charges. While the record

demonstrates that Baker blatantly broke the law by growing, possessing, and trafficking marijuana, his crimes did not have a significant nexus with Warren County, thus venue was not proper there. As an appellate court, we are bound to apply the rule of law and reach a decision based upon constitutional and statutory precepts, rather than orchestrate a futile attempt to make the facts fit legal standards in an effort to reach a conclusion that may be just, but nevertheless, contrary to law.

{¶ 40} The Ohio Supreme Court, in a four to three decision, held that a judgment of acquittal is to be entered when the state fails to prove venue, and that such acquittal was a "final verdict" as that term is used in R.C. 2945.67(A). *Hampton*, 2012-Ohio-5688. The dissenting opinion in *Hampton* suggested that a defendant who has charges brought against him in an improper venue should be tried for his crimes in the proper venue instead of receiving a total reprieve. "[I]f the state fails to prove venue in a criminal case or if it is established that a crime occurred in a county different from where the trial is held, the trial court should dismiss the indictment or transfer the case for prosecution to the county where the offense occurred without any double-jeopardy concerns." *Id.* at ¶ 48. While this approach to venue may be appealing, we are bound to follow established precedent. *State v. Skatzes*, 2d Dist. No. 15848, 2003-Ohio-516, ¶ 392.

{¶ 41} Having found that the state failed to prove that Warren County was the proper venue, Baker's first assignment of error is sustained.

{¶ 42} Assignment of Error No. 2:

{¶ 43} THE TRIAL COURT ERRED BY CONVICTING BAKER OF CULTIVATING MORE THAN 20,000 GRAMS OF MARIJUANA.

{¶ 44} Baker argues in his second assignment of error that the trial court erred by convicting him of cultivating 20,000 grams of marijuana because the state did not weigh the marijuana once it was dried and separated from the stalk. However, given our disposition of

the first assignment of error, this assignment of error is moot.

{¶ 45} Judgment reversed, Baker's convictions are vacated, and Baker is hereby discharged.

RINGLAND, P.J., and M. POWELL, J., concur.