[Cite as *State v. Rose*, 2023-Ohio-1611.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                  CASE NO.  1-22-15

    v.

GRANT ROSE,                            O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No.  CR 2020 0432

**Judgment Affirmed**

Date of Decision:  May 15, 2023

APPEARANCES:

    *William T. Cramer* **for Appellant**

    *Andrea K. Boyd* **for Appellee**

**EPLEY, J.**

{¶1} Defendant-appellant Grant Rose appeals from his conviction in the Allen County Court of Common Pleas after he was found guilty of one count of participating in a pattern of corrupt activity, 13 counts of trafficking in persons for commercial sex acts, and one count of promoting prostitution, and then sentenced to an aggregate prison term of 42 ½ years. For the reasons that follow, the judgment of the trial court is affirmed.

## I. Facts and Procedural History

{¶2} S.H., who was 19 at the time of trial, was, from a young age, raised by her grandparents; her biological parents were both drug addicts. In fact, between the ages of 4 and 11, she had no contact with her mother or father. In June 2014, her grandfather passed away and her relationship with her grandmother deteriorated. As a result, S.H. began reaching out to her mother, Susan W., through Facebook Messenger. S.H. testified that she was hoping for a relationship with her mother.

{¶3} In July 2014, at age 11, S.H. began sneaking out of the house at night to meet up with Susan. When she met with her mom, she also met with Susan's boyfriend, Grant Rose, whom, she noted, *always* drove. The very first time they picked up S.H., "[Susan] had beer, and they were on their way to go buy some crack." Trial Tr. at 141-142. When they arrived at their drug dealer's house, Susan and Rose told S.H. to get out of the truck so they could show her off to the drug dealer. S.H. was instructed to go inside the house and do what the man wanted to

do. Once inside, she engaged in oral and vaginal sex with the dealer, and when finished, Rose and Susan got drugs and money from the man.

{¶4} Over the course of the next several years, S.H. was, on a regular basis, subjected to similar situations. Sometimes she would have sex for money and drugs at the "customer's" house, sometimes in a car, and other times at the house Rose shared with Susan. When the encounter was over, the customer would pay Susan or Rose. What stayed constant, though, was that Rose always drove to the "dates."

{¶5} S.H. testified that she soon began using drugs and running away from home frequently. She would sometimes stay at Rose and Susan's home, and other times with customers or dealers. In 2018, when she was 15, there was a 5 or 6 week stretch that S.H. consistently lived with her mother and Rose. During that time, Rose would take her out to parks or hotel rooms to meet customers that they had met through apps like "Plenty of Fish" and "Meet Me." Both Susan and Rose helped S.H. set up the profiles and Rose set the prices.

{¶6} Around that same time, Susan was jailed, but the constant flow of customers did not stop. S.H. testified that she had customers every day, sometimes multiple times a day. After the sex act was completed, Rose would get the money and then put it on Susan's jail account.

{¶7} Additionally, many of S.H.'s "dates" were at Rose's house. The constant influx of men raised red flags for one of the home's other occupants, Tryson Gipson,

who, at the time, was dating Debbie McIntosh. Gipson worked the overnight shift at a local plant, and on several occasions noticed strange cars parked in the driveway upon his return in the pre-dawn hours. He also saw unknown men exiting S.H.'s bedroom and then give her money. After seeing this and overhearing conversations between Susan and Debbie about S.H., Gipson became worried and informed law enforcement.

{¶8} Soon after, S.H. was removed from the Rose house by the police for being a runaway. From there, she spent time in juvenile detention, and when she turned 16, was sent to a group home for human trafficking survivors where she stayed approximately 10 months. Following her time in the group home, S.H. was placed in foster care in Columbus where she stayed until her 18th birthday. It was during this time period when S.H. came in contact with Detective Stechschulte of the Lima Police Department.

{¶9} Just before S.H. got out of foster care, she got back in contact with Susan who told her that she was no longer using drugs. "She would tell me, like 'Yea, she's clean. She's not doing anything. She's doing real good.' " Trial Tr. at 175. Resultantly, because S.H. did not have enough money saved for an apartment of her own, she decided to move back in with her mother and Rose. She quickly discovered that Susan was not, in fact, clean. S.H. found herself, once again, in a toxic environment. Susan was using hard drugs and prostituting, and there was a

surplus of other people living in the house as well, including S.H.'s half-sister, Grant's daughter, Grant's daughter's boyfriend, Susan's girlfriend, and Grant. Susan also had a "sugar daddy" named Jack living there.

{¶10} S.H. stayed clean for a couple weeks, but soon began using drugs (crack cocaine) along with the others in the home. Before long, the household money ran out - S.H. had to start servicing customers again, many through the site "Secret Benefits." Some of these "dates" happened at the house, but some men were uncomfortable because of the large number of people there. In those cases, Rose and Susan would take S.H. to them. If Susan was not there, the customer would pay Rose.

{¶11} Throughout the years, S.H. stayed in periodic contact with Detective Stechschulte, and on December 2, 2020, they conspired to set up a sting operation to bring Susan and Rose to justice. Posing as a customer on "Secret Benefits," Detective Stechschulte set up a date with S.H. The app was used to coordinate pricing and services, and the purported date was to happen at a Lima hotel. Rose and Susan drove S.H. to the selected location, and when they arrived, S.H., as usual, went inside while Susan and Rose waited in the car for her to come back with the first portion of the money. The total negotiated amount was $600 for the night and S.H. brought down $250 given to her by the detective; the rest would be due when

they picked her up. In addition to the money, Detective Stechschulte gave S.H. a listening device to record her conversation with Rose and Susan.

{¶12} The recording device did its job and picked up a conversation between S.H., Susan, and Rose. The majority of the conversation revolved around mother and daughter negotiating how much money S.H. would get to keep, but Rose can be heard asking if S.H. needed a crack pipe. Following the recorded conversation, S.H. went into the hotel to meet back up with Detective Stechschulte, while Rose and Susan drove off so they could purchase drugs. They were arrested a few minutes later.

{¶13} On January 14, 2021, Rose was indicted on fifteen counts: Count 1 – engaging in a pattern of corrupt activity (first-degree felony), Counts 2-14 – trafficking in persons for commercial sex acts (first-degree felonies), and Count 15 – promoting prostitution (fourth-degree felony). The case proceeded to a jury trial on February 1, 2022; on the morning of trial, however, with the jurors waiting to come into the courtroom, Rose asked to have his attorney "dismissed from the case." The trial court denied the motion, reasoning that it was too late for a change and that defense counsel was ready and willing to proceed. The trial then commenced, and the jury heard testimony from State's witnesses: S.H., Susan (who was also charged but worked out a plea deal to testify against Rose), Gipson, Detective Stechschulte, and Officer Aaron Montgomery (another officer involved in the sting operation).

Rose testified on his own behalf, as did his daughter and granddaughter. The jury also considered several exhibits, including jail calls between Rose and Susan, an interview Rose did with Detective Stechschulte, text messages between the detective and S.H., and the recorded conversation between S.H., Susan, and Rose during the sting operation.

{¶14} After a short deliberation, the jury returned with guilty verdicts on all counts. Rose was sentenced to 11 years on the engaging in a pattern of corrupt activity count (Count 1), maximum mandatory terms of 15 years on all of the human trafficking counts (Counts 2-14), and 18 months for promoting prostitution (Count 15). The court ordered that Counts 1, 2, 5, and 15 be imposed consecutively for an aggregate prison term of 42 ½ years. The court also imposed five years of mandatory post-release control and designated Rose as a Tier II sex offender.

{¶15} Rose has filed a timely appeal.

## II. Counsel of Choice

{¶16} In his first assignment of error, Rose argues that his right to effective assistance of counsel was violated when the trial court denied his request to continue the trial so he could fire his appointed counsel and retain counsel of his choice. We disagree.

{¶17} The Sixth Amendment to the United States Constitution states that "[i]n all criminal prosecutions, the accused shall *** have the Assistance of Counsel

Case No. 1-22-15

for his defense." Similarly, Section 10, Article I of the Ohio Constitution provides that "[i]n any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel." This right to counsel includes the right to be represented by counsel of choice when the defendant has the ability to retain counsel. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006). That means that the right to counsel of choice does not extend to defendants who require counsel to be appointed for them. *Id.* at 151; *State v. Cowans*, 87 Ohio St.3d 68, 72, 717 N.E.2d 298 (1999).

{¶18} The Supreme Court has also recognized that a trial court has wide latitude in balancing the right to counsel of choice against the interest of fairness and the demands of its calendar. *Id.* at 152, citing *Morris v. Slappy*, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983).

{¶19} Along with the right to counsel of choice comes the right to discharge that counsel, but the defendant must demonstrate a "breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel." *State v. Coleman*, 37 Ohio St.3d 286, 292, 525 N.E.2d 792 (1988). A trial court has wide latitude to decide whether to grant a defendant's request to change court-appointed counsel and as such, it is reviewed under an abuse of discretion standard. *Cowans*, 87 Ohio St.3d at 73; *State v. Cook*, 3d Dist. Union No. 14-10-05, 2010-Ohio-4814, ¶ 12. To constitute an abuse of

discretion, a trial court's action must be arbitrary, unreasonable, or unconscionable. *Ojalvo v. Bd. of Trustees of Ohio State Univ.*, 12 Ohio St.3d 230, 232, 466 N.E.2d 875 (1984).

{¶20} Here, on the morning of trial, with the jury pool waiting to enter the courtroom for voir dire, Rose requested that his attorney be "dismissed from the case." He stated that "[his] family decided that we just have to push this back a little longer * * * [so] I have time for somebody to go through this case and prove I had nothing to do with this." Trial Tr. at 3. The court explained that he could not just fire his court appointed attorney and asked Rose if he had another lawyer lined up. Rose told the court that he did not have retained counsel but claimed his family was trying to find one.

{¶21} An indigent defendant who has court-appointed counsel certainly has the right to counsel but does not have the right to counsel of choice. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 148. Replacement is only required if there is an extreme breakdown in the attorney-client relationship. *Coleman* at 292. There is no evidence in the record that the relationship between Rose and his attorney reached that level.

{¶22} During the hearing on the matter, Rose alleged that his attorney was poorly representing him and lied to him – allegations defense counsel refuted. The court asked counsel if he was prepared to represent Rose. When counsel answered

in the affirmative, that response was affirmed by the prosecutor who told the court that she had had many conversations with counsel and was convinced he was ready to go. The State then informed the court that Rose's co-defendant, Susan, had recently made a deal to plead guilty in exchange for testifying against Rose. The prosecutor stated that she had provided defense counsel with the terms of the agreement so he could be prepared for cross examination. Finally, the record indicates that defense counsel had requested (and received) funding to hire a private investigator to aid in Rose's defense.

{¶23} The court ultimately denied Rose's motion, calling his defense counsel competent and experienced, and described the motion as, "at best, an 11th hour request." It further stated that it considered the motion as a delay tactic because even though Rose said he was going to hire retained counsel, none had appeared, and he had over a year to do so.

{¶24} Based on the record before us, we cannot say that the trial court abused its discretion by denying Rose's request for time to hire new counsel. Even if there was some disagreement between Rose and his counsel, it did not amount to a "breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel." *Id*. The evidence shows that counsel was prepared and ready to proceed with trial and that Rose really was just trying to delay the proceeding. He said so himself, telling the court that "[his] family

decided that we just have to push this back a little longer[.]" Rose's first assignment of error is overruled.

### III. Manifest Weight

**{¶25}** In his second assignment of error, Rose asserts that the guilty verdicts were not supported by the weight of the evidence because the State did not prove "knowledge." Accordingly, our analysis will focus on the mens rea elements of the crimes.

**{¶26}** When an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A case should not be reversed as being against the manifest weight of the evidence except "'in the exceptional case in which the evidence weighs *heavily* against the conviction.'" (Emphasis added.) *Id; Accord State v. Jackson,* 169 Ohio App.3d 440, 2006-Ohio-6059, 863 N.E.2d 223, ¶ 14 (6th Dist.).

**{¶27}** "When engaged in this limited reweighing, the appellate court may not merely substitute its view for that of the trier of fact[.]" *State v. Thompson*, 10th

Dist. Franklin No. 16AP-812, 2017-Ohio-8375, ¶ 25. "It is well-established that when conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *In re M.J.C.*, 12th Dist. Butler No. CA2014-05-124, 2015-Ohio-820, ¶ 35; *State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ¶ 44.

Trafficking in Persons

{¶28} When the offenses occurred, R.C. 2905.32(A)(2)(a) stated that a person shall not knowingly recruit, lure, entice, isolate, harbor, transport, provide, obtain, or maintain a person less than 16 years of age (the statute now says 18) to engage in sexual activity for hire with a third party. Accordingly, the State needed to prove that Rose knew that S.H. was going to be engaging in sex for money/drugs when he drove her places.

{¶29} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct with probable cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails

-12-

to make inquiry or acts with a conscious purpose to avoid learning the fact." R.C. 2901.22(B).

{¶30} Testimony showed that from the very first time she contacted Rose and Susan, at age 11, S.H. was, at their behest, engaging in sex for hire. She testified that the first night, Rose drove her to a drug dealer's residence where her mother told her to "get out of the truck so she could show me off to her drug dealer." Trial Tr. at 142. According to S.H., Rose was standing right next to Susan. S.H. was then instructed to go into the house and do whatever the dealer wanted to do. After engaging in oral and vaginal sex with the drug dealer, Rose and Susan were given money.

{¶31} S.H. told the jury that she engaged in sex for money or drugs countless times starting at age 11, and when the "dates" happened away from their house, Rose *always* drove. *See* Trial Tr. at 146, 147, 152, 153, 161, 184, 190, 202, 207. S.H. made it clear that Rose always knew where he was taking her and for what purpose. Trial Tr. at 161, 202. Rose's involvement is best illustrated by S.H.'s testimony on cross-examination:

> **Defense Counsel**: Through the years – so, this goes back to 2014, I believe, through 2020, over that six-year period, how many times would you say Grant [Rose] drove you someplace?
>
> **S.H.**: It was every time, every time there was a customer.

-13-

**Defense Counsel**: And did he know where he was taking you or why he was taking you?

**S.H.**: Yea.

Trial Tr. at 202.

{¶32} According to S.H., Rose was also part of the business side of things, helping her set up profiles on apps by picking out pictures to use and then collecting money or drugs afterwards.

{¶33} Susan's testimony also confirmed Rose's knowledge and involvement. She confirmed that Rose was always the driver, but in addition, recounted that he also helped arrange the "dates" and helped set the prices. Trial Tr. at 222, 223, 228, 229, 230. During cross examination, she testified that "Grant Rose has been involved with sex for hire, or for prostitution, and crack cocaine even before me. So, he knew what was going on." Trial Tr. at 255.

{¶34} Tryson Gipson, who lived at Rose's house at the same time S.H. did, also testified that he would see strange men leaving S.H.'s room and then pay Rose. Trial Tr. at 273.

{¶35} In addition to witness testimony indicating that Rose was intimately involved with S.H. having sex for money and drugs, the jury also considered several exhibits that demonstrated Rose's involvement. First, the State introduced Exhibits C1, C2, C3 – jail calls between Susan and Rose in 2018 when Susan was

incarcerated. In one call, Rose describes a "date gone wrong," telling Susan that S.H. had a client over, but instead of paying, the man took off running out the back. In another, Susan tells Rose to wake up S.H. to have her go make money, to which he responds that she has been unsuccessfully trying all night. When asked to clarify what she meant by "make money", Susan testified that she was referring to S.H. prostituting.

{¶36} Finally, there was the sting operation which ultimately brought down Susan and Rose. It is undisputed that on December 2, 2020, Rose drove S.H. to a Lima hotel for what he and Susan thought was just another "date." S.H. testified that Rose knew where they were going and why they were going there because he and Susan discussed it before they left the house. Instead of going in the hotel to engage in sex like normal, S.H. returned to the truck wearing a listening device that picked up a conversation between S.H., Susan, and Rose. The majority of the conversation consisted of S.H. and Susan negotiating how much money S.H. would keep, but Rose can be heard asking if S.H. needed a crack pipe for the evening with the supposed client.

{¶37} Officer Aaron Montgomery (one of the officers involved with the sting), testified that from his position in a nearby car, he was able to observe S.H. give money to Susan, and then thanks to the listening device, heard them discuss how much money each party would get. He testified that Rose was right in the

driver's seat and was involved in the conversation. It is undisputed that Rose was driving the car when officers pulled it over a short time later.

**{¶38}** The evidence points to Rose being well aware that he was transporting S.H. to engage in prostitution.

Promoting Prostitution

**{¶39}** Rose was also convicted of promoting prostitution, in violation of R.C. 2907.22(A)(3). Here, the State had to prove that on December 2, 2020, the date of the sting operation, Rose knowingly transported S.H. to facilitate her engaging in sex for hire. Based on the evidence presented above, there can be little doubt Rose knew that he was taking S.H. to the hotel so she could have sex for money.

**{¶40}** Engaging in a Pattern of Corrupt Activities

**{¶41}** Finally, Rose was convicted of engaging in a pattern of corrupt activities, which, as he points out in his brief, is a strict liability crime. Appellant's Brief at 23; *State v. Schlosser*, 79 Ohio St.3d 329, 331, 681 N.E.2d 911 (1997). Correspondingly, the State is not required to prove a mens rea. Instead, there just had to be proof that Rose committed trafficking in persons or promoting prostitution – and there was proof as to both crimes.

**{¶42}** Based on the evidence in the record, it is clear that this is not one of the exceptional cases in which the evidence weighs heavily against the conviction. In fact, it is quite the opposite as the jury was presented with overwhelming evidence

that Rose had knowledge of his crimes. Therefore, his second assignment of error is overruled.

### IV. Conclusion

{¶43} The judgment of the trial court is affirmed.

*Judgment Affirmed*

**MILLER, P.J. and ZIMMERMAN, J., concur.**

**/jlr**


**\*\* Judge Christopher B. Epley of the Second District Court of Appeals, sitting by Assignment of the Chief Justice of the Supreme Court of Ohio.**