[Cite as *JPMorgan Chase Bank, N.A. v. Asbury*, 2018-Ohio-1652.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

JPMorgan Chase Bank, NA

      Appellee

v.

Daniel Asbury, et al.

      Appellees

[Marilyn S. Wilson—Appellant]

Court of Appeals Nos. H-16-030
H-16-033

Trial Court No. CVE 20130332

**<u>DECISION AND JUDGMENT</u>**

Decided: April 27, 2018

* * * * *

Cynthia A. Lammert, George S. Coakley and Richard T. Lobas,
for appellees.

Reese M. Wineman, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

**{¶ 1}** This is a consolidated appeal from the judgments of the Huron County Court

of Common Pleas, granting a directed verdict in favor of appellees, Patrick Spettel and

Coffman Group, Inc., dba RE/MAX Quality Realty, on appellant's, Marilyn Wilson,

claims for civil conspiracy and violations of the Ohio Corrupt Practices Act and the federal RICO Act, and denying appellant's motion for a new trial. For the reasons that follow, we affirm.

## I. Facts and Procedural Background

{¶ 2} Procedurally, this case began as a residential foreclosure action initiated by JPMorgan Chase Bank, N.A. against Daniel and Michelle Asbury, the owners of the property located at 2701 State Route 598, New Haven, Ohio. Appellant was also named as a defendant in the original complaint based upon a potential interest she had in the property via a land installment contract executed between herself and Daniel Asbury.

{¶ 3} Appellant answered and filed a cross-claim against Daniel Asbury, joining as additional defendants to the cross-claim: HCMS Home Loans ("HCMS"), Huron County Title Agency, LLC, and appellees. The first count of the cross-claim alleged that Asbury, HCMS Home Loans, Huron County Title Agency, LLC, and appellees engaged in a pattern of corrupt activity in violation of R.C. 2923.32 and 18 U.S.C. 1961 et seq., and the second count alleged that those same defendants engaged in a civil conspiracy. The gravamen of the claims was that the defendants acted in concert to deprive appellant of her equity in the real property.

{¶ 4} Appellant's cross-claims and the foreclosure action were bifurcated, with the former proceeding to a jury trial over the course of six days beginning on June 7, 2016. At the trial, the following facts were adduced.

2.

**{¶ 5}** Appellant originally owned the home at 2701 State Route 598. In 2003, Countrywide Home Loans ("Countrywide") foreclosed on the property, and was awarded the deed in a sheriff's sale. In the spring of 2004, Spettel, acting as the real estate agent for Countrywide, visited the home to determine its occupancy status for the purpose of reselling the property. Appellant, not wanting to leave her home, spoke with Spettel about purchasing the home from Countrywide. Appellant indicated that she was about to receive $110,000 from the sale of some other property that she could use towards the purchase. Spettel, then acting as a disclosed dual agent, assisted appellant by drafting an offer to purchase the home from Countrywide. The May 21, 2004 offer included a purchase price of $155,900, with a down payment of $110,000, and was contingent upon appellant obtaining financing for the remaining $45,900. As part of the offer, appellant gave Spettel a check for $1,000 as an earnest money deposit. Countrywide rejected the offer.

**{¶ 6}** Appellant then contacted her attorney from the foreclosure action, Tom Stoll, who recommended that she contact Dan Asbury at HCMS. HCMS was a mortgage origination company, and Asbury was a mortgage broker. It was disputed at trial whether Asbury owned an interest in HCMS. When appellant arrived at HCMS, she spoke with Mike Finegan, who attempted to get her qualified for a loan. Appellant met with Finegan several times, but he was unable to secure financing for her. Finegan then referred appellant to Asbury. Appellant explained her situation to Asbury, and he offered to help

3.

her by purchasing the home himself, and then selling it to her on a land installment contract.

{¶ 7} On June 2, 2004, appellant and Asbury then met with Spettel, who, again as a disclosed dual agent, drafted a purchase agreement in which appellant offered to buy the home from Asbury for $155,900, with a $1,000 earnest money deposit, $109,000 being placed in escrow at the closing, and the remaining balance to be financed by Asbury in the form of a land installment contract at 8.5 percent interest with a 30-year amortization. The monthly payment was stated to be $352 plus escrow for taxes and insurance, with a balloon payment within 24 months of filing of the land contract. Included in the terms of the purchase agreement were standard terms regarding title and conveyance:

> **12. Title.** An Owner's Fee Policy of Title Insurance in the amount of the purchase price shall be provided to the Purchaser showing good and marketable title in fee simple, free and clear of all liens and encumbrances except those specifically set forth in this agreement. * * * If a defect in the title appears, Seller shall have thirty (30) days after notice to remove such defect. If the defect can not be remedied, then, at the option of the Purchaser, all funds and documents shall be returned to the parties depositing them and this agreement shall be null and void.

> **13. Conveyance.** Seller shall deliver to Purchaser a general warranty deed with appropriate release of dower (or fiduciary deed, if

4.

applicable), conveying a good and marketable title in the Property to the Purchaser free and clear of all liens and encumbrances whatsoever * * *.

Further, it was handwritten by Spettel into the agreement that "Acceptance of this offer is contingent upon Dan and Michele Asbury being able to purchase this home from Countrywide and obtaining a clear deed."

{¶ 8} Thereafter, Asbury, with Spettel again acting as a disclosed dual agent, offered to buy the home from Countrywide for $147,000, which Countrywide accepted on June 10, 2004. To pay for the home, Asbury obtained financing through HCMS for $102,900. Regarding the financing, Spettel testified that he believed he forwarded a loan pre-approval letter from Asbury to Countrywide. That loan was ultimately approved and underwritten by Flagstar Bank.

{¶ 9} On June 12, 2004, appellant deposited a check for $110,000 with the Huron County Title Agency, LLC, who was acting as the escrow closing agent for purposes of this transaction. Asbury had an ownership interest in the Huron County Title Agency, LLC.

{¶ 10} On June 14, 2004, Dan and Michele Asbury accepted appellant's June 2, 2004 offer to purchase the home.[1] The terms of the purchase agreement were then sent to appellant's attorney, who drafted the land installment contract. The land installment contract provided for financing of $49,600 at 8.5 percent interest. It stated that the

---

[1] The June 2, 2004 purchase agreement was signed by Dan and Michele on June 14, 2004, however the boxes for "Accepts," "Rejects," or "Counter Offer" were not checked.

5.

monthly payment on the principal and interest would be $548.62 beginning on July 1, 2004, with the remaining balance due on or before July 1, 2010.  Further, the land installment contract provided that appellant agreed to pay the taxes and insurance "over and above the obligation of monthly installments as set forth in this Agreement."  Upon fulfillment of all of the obligations of the agreement, Asbury was to convey to appellant a "good and sufficient deed of general warranty" to the property.

{¶ 11} Additionally, regarding mortgages and other encumbrances, the land installment contract included the following provisions:

> 2. Existing Mortgages and Other Encumbrances.  The premises are subject to mortgage to _____ from _____, recorded in Mortgage Book _____, pages _____ in the office of the Recorder of Huron County, to secure repayment of the original principal sum of fourty [sic] nine thousand six hundred dollars ($49,600).
>
> * * *
>
> 11. Subsequent Mortgage or Encumbrance. In the event that Vendors hereafter cause or suffer any part of the real estate to be mortgaged or encumbered, the Purchasers at their option shall have the right to make all further payments required under this Agreement to the holder of the mortgage or encumbrance until the same is fully discharged.

12. Payment by Purchasers on Mortgages in Default. If the Vendors default on any mortgage on the property, Purchasers shall have the right to pay on such mortgage and receive credit on this Agreement for Purchase.

{¶ 12} On July 6, 2004, the sale from Countrywide to Asbury closed. The settlement statement from that transaction shows that Asbury financed $102,900 of the purchase price. As part of that transaction, a mortgage interest was created in favor of HCMS in the amount of $102,900. The settlement statement also shows that $8,820 was paid to Re/Max Quality Realty in commission.

{¶ 13} On that same date, the land installment contract was also executed. Appellant testified that while she knew that Asbury was taking out a loan to purchase the property, she believed that he was borrowing approximately $40,000. Appellant testified that neither Asbury nor Spettel ever told her that Asbury was borrowing $102,900. Nancy Snyder, who worked at Huron County Title Agency, LLC, at the time, testified that of the $110,000 that appellant deposited, approximately $44,000 was used as the down payment in the Countrywide to Asbury transaction, and the remaining amount was disbursed to Asbury. Notably, Spettel did not receive a commission from this transaction.

{¶ 14} Appellant then began making her monthly payments, and it was undisputed that she faithfully made those payments every month.

{¶ 15} On January 10, 2005, Spettel's office sent appellant a form letter, thanking her for her business. In the letter, Spettel stated, "Even though your property has closed,

7.

I hope that you do not hesitate to call me if you have any real estate questions or concerns whatsoever. I have included copies of your closing documents in hopes these will assist you in your tax preparation." Attached to the letter was a redacted copy of the settlement statement from the Countrywide to Asbury transaction. The redactions omitted the information regarding Asbury's side of the transaction, including the source of the funds used for the purchase. Wilson testified that she glanced at the letter, did not think anything of it, and threw it in a drawer. Spettel testified that the settlement statement was attached by mistake, and probably was included because it involved the same property.

{¶ 16} Following the January 10, 2005 letter, appellant continued to make her monthly payments to Asbury. In early February 2010, appellant noticed that the balance of the land contract was coming due on July 1, 2010. Appellant went to see Asbury, who indicated that he thought that she had 30 years to pay the loan. Nonetheless, the parties executed a document that extended the loan repayment period to July 15, 2015. Appellant indicated to Asbury at that time that she would like to get a loan to pay the remaining balance on the land contract. Asbury was unable to give appellant a payoff amount at that time.

{¶ 17} Appellant began contacting other mortgage companies seeking approval for a loan to refinance the land contract. Sherod McGuire, then of Red Brick Mortgage, testified that appellant qualified for a loan, but he was unable to obtain a payoff amount from Asbury. Asbury informed McGuire that he could not provide the payoff because he had filed for bankruptcy, and the house was included in the bankruptcy proceedings.

8.

**{¶ 18}** Appellant continued making her monthly payments to Asbury. The next relevant event occurred in February 2011, when Spettel informed Asbury that an audit of RE/MAX's trust accounts revealed that the $1,000 earnest money paid by appellant initially as part of her offer to Countrywide, and later as part of her offer to Asbury, had not been disbursed. Notably, Spettel had not had any contact with appellant in the intervening years except for one encounter where he commented that it was nice that they were able to save her home. Spettel also never discussed appellant or the ongoing land contract payments with Asbury during this time.

**{¶ 19}** Spettel prepared a document so that the funds could be released to Asbury. However, at a meeting between Asbury, Spettel, and appellant, Asbury indicated that appellant needed the money more than he did, so the funds should be given to her. On February 16, 2011, the parties signed a "Release of Purchase Agreement," which provided:

> Each of the parties hereto in consideration of each of the parties releasing all of the other parties from the aforesaid purchase agreement, do hereby release each of the other from their obligations to perform. All claims, actions or demands which each of the parties hereto may have up to the date of this agreement against any of the parties hereto are released.

> It is the intention of this agreement that any responsibility or obligations or rights arising by virtue of the earnest money are by this

release declared null and void and of no further effect when signed by all above named parties.

{¶ 20} Spettel testified that the sole purpose of the form was to be able to release the $1,000 from RE/MAX's trust accounts. However, Dale Coffman, the principal officer of appellee, Coffman Group, Inc., later testified that Spettel used the wrong form to release the earnest money, and that there was a separate form that did not include any release of rights. In any event, the $1,000 was refunded to appellant in April 2011.

{¶ 21} Ultimately, Asbury stopped making the mortgage payments on the property, and JP Morgan Chase Bank, N.A., initiated the action to foreclose.

{¶ 22} Following appellant's presentation of evidence, appellees moved for a directed verdict. After a lengthy discussion, the trial court granted appellees' motion, finding that reasonable minds could only conclude that there was a failure of proof regarding the elements of the predicate acts required to support the claims of civil conspiracy and violations of the Ohio Corrupt Practices Act and the federal RICO Act. The trial court's findings were memorialized in a judgment entered on July 11, 2016.

{¶ 23} Thereafter, the remaining defendants rested without presenting any evidence, and the jury later returned with a verdict in favor of appellant and against Asbury, HCMS, and Huron County Title Agency. Judgment was entered against Asbury in the amount of $138,192.24, and against HCMS and Huron County Title Agency, jointly and severally, in the amount of $110,000.

10.

{¶ 24} Subsequently, on June 29, 2016, appellant moved for a new trial, challenging the directed verdict in favor of appellees. The trial court denied that motion on July 29, 2016.

## II. Assignments of Error

{¶ 25} Appellant has timely appealed the trial court's judgments, and now asserts two assignments of error for our review:

I. The trial court below abused its discretion by, on June 13, 2016, granting the motion of Patrick R. Spettel, RE/MAX Quality Realty, and the Coffman Group, Inc., D.B.A. RE/MAX Quality Realty, to dismiss the case against them based upon the plethora of evidence linking them to the predicate acts and, specific, involvement in the attempt to deprive Marilyn Wilson of the equity in her home through the RICO activity of the defendants and the civil conspiracy.

II. Following the trial court's dismissal of the defendants, Patrick R. Spettel, RE/MAX Quality Realty, and the Coffman Group, Inc., D.B.A. RE/MAX Quality Realty, on June 13, 2016, and the return of the jury's verdict on June 14, 2016, the trial court abused its discretion and denied Marilyn S. Wilson of a fundamental constitutional right to have her case considered by an unbiased trier-of-fact when Judge Pokorny denied her motion for a new trial, on June 29, 2016, to determine her rights as a, now established, victim of RICO activity.

11.

## III. Analysis

{¶ 26} In her first assignment of error, appellant challenges the trial court's judgment granting a directed verdict in favor of appellees. "Because a motion for a directed verdict presents a question of law, appellate review of a trial court's decision on the motion is de novo." *Bennett v. Admr., Ohio Bur. of Workers' Comp.*, 134 Ohio St.3d 329, 2012-Ohio-5639, 982 N.E.2d 666, ¶ 14. Under Civ.R. 50(A)(4), a motion for directed verdict should be granted if "the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party."

{¶ 27} Here, appellant brought claims for violations of the federal RICO act and the Ohio Corrupt Practices Act, and for civil conspiracy.

{¶ 28} The Ohio Corrupt Practices Act is modeled after the federal RICO act, 18 U.S.C. 1961 et seq., and provides, "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt." R.C. 2923.32(A)(1). To state a civil claim under the federal RICO act or the Ohio Corrupt Practices Act, "'a plaintiff must establish: (1) that the conduct of the defendant involves the commission of two or more specifically prohibited state or federal criminal offenses; (2) that the prohibited criminal conduct of the defendant constitutes a pattern; and (3) that the defendant has participated in the affairs of an enterprise or has acquired

12.

and maintained an interest in or control of an enterprise.'" *Morrow v. Reminger & Reminger Co. LPA*, 183 Ohio App.3d 40, 2009-Ohio-2665, 915 N.E.2d 696, ¶ 27 (10th Dist.), quoting *Patton v. Wilson*, 8th Dist. Cuyahoga No. 82079, 2003-Ohio-3379, ¶ 12.

{¶ 29} Likewise, to demonstrate a civil conspiracy, appellant must show "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419, 650 N.E.2d 863 (1995).

{¶ 30} Here, appellant argues that appellees, in conjunction with Asbury, HCMS, and Huron County Title Agency, engaged in an enterprise to commit the theft of appellant's $110,000 equity interest in the home created by her deposit of such money in June 2004, and the theft of $42,792.36 in equity that appellant created by making regular monthly payments on the land installment contract. In particular, appellant identifies the predicate acts of the corrupt activity committed by appellees as theft in June and July 2004, mail fraud in January 2005 in relation to the alleged "lulling letter" sent by Spettel, and grand theft, theft by deception, or securing writings by deception in relation to the February 2011 release of the $1,000 earnest money, which appellant argues operated as a release of any claims she may have against Asbury, HCMS, or Huron County Title Agency.

{¶ 31} Appellees, on the other hand, argue that appellant's claims must fail because she has not demonstrated an enterprise, a pattern of corrupt activity, or the commission of any predicate act.

13.

**{¶ 32}** Upon review, we find that appellant has not demonstrated that appellees were engaged in an enterprise. "Enterprise" is defined as "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity." R.C. 2923.31(C). Here, appellant alleges that appellees were engaged in an "association in fact" with Asbury, HCMS, and Huron County Title Agency. An "association in fact" is "a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948, 129 S. Ct. 2237, 173 L.Ed.2d 1265 (2009). Similarly, the tort of civil conspiracy requires a "malicious combination," which may be proven by establishing "a common understanding or design, even if tacit, to commit an unlawful act." *Gosden v. Louis*, 116 Ohio App.3d 195, 219, 687 N.E.2d 481 (9th Dist.1996). In this case, appellant asserts that the common purpose was to deprive appellant of her equitable interest in the home.

**{¶ 33}** Contrary to appellant's protestations, the record does not contain any evidence that appellees were engaged in a continuing unit or malicious combination with Asbury, HCMS, and Huron County Title Agency for the common purpose of depriving appellant of her equitable interest in the home. Spettel initially became involved with appellant as the real estate agent for Countrywide. Spettel then assisted appellant and became her agent when she made an offer to purchase the home back from Countrywide after the foreclosure. When that offer failed, appellant sought advice from her attorney, Tom Stoll. It was Stoll, not Spettel, who directed appellant to HCMS and Asbury.

14.

{¶ 34} Appellant and Asbury then concocted the plan for Asbury to buy the home and sell it to appellant on a land contract. Spettel drafted appellant's offer to purchase the home from Asbury based upon the terms provided to him by appellant and Asbury. As further evidence of Spettel's lack of participation and purpose to steal appellant's equitable interest, the agreement drafted by Spettel required Asbury to convey to appellant good and marketable title, free of any liens and encumbrances. Moreover, the offer was made expressly contingent upon Asbury "being able to purchase this home from Countrywide and obtaining a clear deed."

{¶ 35} Thereafter, the terms were sent to Tom Stoll, who drafted the land installment contract. Notably, the land installment contract differed materially from the offer to purchase regarding the payment terms. The land installment contract also, rather than requiring Asbury to first obtain a clear deed, contemplated that the property would be subject to an existing mortgage, although in the amount of $49,600. Spettel was not present when the land installment contract was executed, and he did not receive any commission from that transaction.

{¶ 36} Appellant makes much of the fact that Spettel did not inform her that Asbury was getting a mortgage in the amount of $102,900. However, any purported breach of a duty that he owed her as her agent to disclose that information does not demonstrate that he had a purpose to steal her equitable interest since (1) appellant already knew that Asbury was getting a mortgage to buy the property and that her interest would be second in line to the mortgage, (2) the purchase agreement drafted by Spettel

required Asbury to obtain and convey a clear title, and (3) Spettel had no role in drafting or executing the land installment contract that contemplated the existing mortgage.

{¶ 37} Regarding the January 2005 letter that Spettel sent to appellant, it is undisputed that it was a "form letter," and that the language contained therein was sent to all of Spettel's clients who purchased a house that year. Appellant claims that the description of the property as "your property" somehow lulled her into not taking action to uncover the ongoing fraud. However, we fail to make that connection as appellant was already aware that Asbury owned the property and had taken out a mortgage on the property. Further, the erroneous inclusion of the settlement statement could not have convinced appellant that it was in fact her property, because she was not a party to the transaction that the settlement statement described. Thus, we find that Spettel's colloquial use of "your property" in the 2005 form letter—and the one chance encounter in which he stated that it was nice that they could save her home—does not demonstrate that appellees had a purpose to deprive appellant of the equity in the home.

{¶ 38} Nor does the February 2011 release of purchase agreement demonstrate that appellees had a common purpose with Asbury, HCMS, and Huron County Title Agency to steal appellant's equitable interest. Spettel testified that the sole purpose of the form that he had appellant sign was to be able to release the $1,000 earnest money that had been sitting in RE/MAX's trust account for the past six years. Appellant has not provided any direct evidence that Spettel had an ulterior purpose, thus she relies on the purported effect of the release to infer appellees' intent to deprive her of the equity.

16.

Notably, appellant is the only one who has taken the position that by signing the February 2011 form, she has released all of her potential claims against all of the cross-claim defendants. Nevertheless, even if appellant is correct that the February 2011 document released any claims she may have had regarding the purchase agreement, its efficacy in proving a nefarious intent on the part of appellees is tempered by the fact that appellant still retained all the rights she had under the land installment contract.

{¶ 39} Finally, it should be noted that appellant has not alleged any way in which appellees have benefitted financially from the purported scheme to defraud: appellees' commission from the sale from Countrywide to Asbury was paid by Countrywide, for whom he was initially employed; appellees did not receive a commission from the land installment contract from Asbury to appellant; and there is no evidence that appellees ever received any of the $110,000 that was deposited with the Huron County Title Agency, or any of the monthly payments that appellant made to Asbury.

{¶ 40} Therefore, viewing the evidence in the light most favorable to appellant, we hold that reasonable minds could only conclude that appellees did not have a common purpose or understanding with Asbury, HCMS, and Huron County Title Agency to steal appellant's equitable interest in the home.

{¶ 41} Appellant, arguing against this result, contends that "lack of purpose" is not a viable defense in a claim for violations of the Ohio Corrupt Practices Act and federal RICO act. In support, appellant cites *State v. Schlosser*, 79 Ohio St.3d 329, 331, 681 N.E.2d 911 (1997), for the proposition that "Ohio's RICO statute, R.C. 2923.32(A)(1),

17.

plainly indicates a purpose to impose strict liability." However, appellant misconstrues the holding in *Schlosser*. *Schlosser* held that because violation of R.C. 2923.32(A)(1) was a strict liability offense, the state did not have to further prove that the defendant knowingly or recklessly engaged in a pattern of corrupt activity involving the criminal enterprise. Nonetheless, a party must still prove that the defendant is involved in an enterprise, which, in the case of an association in fact, requires a demonstration of a common purpose. Because appellant has failed to demonstrate a common purpose, she cannot establish that appellees were involved in an enterprise, and her claims must fail.

{¶ 42} Accordingly, appellant's first assignment of error is not well-taken.

{¶ 43} In her second assignment of error, appellant argues that the trial court erred when it denied her motion for a new trial. Appellant, while citing to numerous documents that were not part of the record before the trial court, asserts that the trial court judge was not unbiased, as he was allegedly involved in a real estate transaction with Spettel acting as an agent during the course of the litigation.

{¶ 44} However, "an appellate court has no jurisdiction to vacate a trial court's judgment based on a claim of judicial bias." *Cooke v. United Dairy Farmers, Inc.*, 10th Dist. Franklin No. 05AP-1307, 2006-Ohio-4365, ¶ 45, citing *Beer v. Griffith*, 54 Ohio St.2d 440, 441-442, 377 N.E.2d 775 (1978).

{¶ 45} Accordingly, appellant's second assignment of error is not well-taken.

18.

## IV. Conclusion

**{¶ 46}** For the foregoing reasons, we find that substantial justice has been done the party complaining, and the judgments of the Huron County Court of Common Pleas are affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

James D. Jensen, J.

Christine E. Mayle, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.